APPEARANCES:
FOR THE PLAINTIFF:
 MATTHEW PALADINO, ESQ. 345 WHITNEY AVENUE NEW HAVEN, CONNECTICUT 06511
 FOR THE DEFENDANT:
 CARL PANTALEO, ESQ. ACTING AS PRO SE
 FOR THE MINOR CHILD:
 LOUIS PARLEY, ESQ. 27 ELM STREET NEW HAVEN, CONNECTICUT 06510
 PATRICIA B. FRADETTE COURT MONITOR
THE FOLLOWING ARE THE COURT'S ORDERS FOR THE ABOVE CASE:
 THE COURT: The parties were divorced in 1994. At the time of the dissolution they submitted an agreement to the Court after many days of trial. At the end of the transcript and Judge Bassick's remarks, there was hope expressed by the judge that that would put an end to years of contentious litigation between the party, and the hope expressed by — or the observation expressed by Attorney Celotto that his client, Mr. Pantaleo, whom he had known since he was a child, had taken the judge's remarks to heart and would hopefully be putting the dispute behind him and moving on. To say that the history of the litigation since that time has proved Judge Bassick over optimistic and Mr. Celotto a bad judge of character in terms of Mr. Pantaleo's desires is an understatement. CT Page 3531
 Ashley — I just have to preface this by saying, sitting in the Regional Family Trial Docket where all I see are contested custody cases — I see children in terrible situations. And absent physical abuse/physical neglect, Ashley is one of the worse situations I've ever seen. She's know little in her entire life but pitched and vehement conflict between her parents.
 Since the date of the dissolution her father willfully, blind to her needs, wrapped in rightiousness and self-justification, has consistently and inappropriately involved her in his struggle to somehow vindicate what he sees as the perceived injustices of the legal system, judges, lawyers, and his ex-wife. He has relentlessly spoken to her about the change in custody, instructed her in his mistaken observations of the law, has told her that she will be able to let the Court know what she wants to do at a certain age and in her child's mind that might be determinative. He has discussed with her his perceived financial difficulties, putting her at the center of what he sees as his own financial tale of woe. But for the fact that he has to pay child support, but for the fact that he has to maintain a home, he could be so much better of a Daddy to poor little Ashley. It's revolting.
 He has undermined the child's relationship with her mother by seeking her allegiance, by instructing her on how to turn on her mother, how to pay her allegiance to him at cost to her mother by what I believe are false allegations against Ms. Pantaleo. He has instructed his child to exaggerate, to lie, and to become the instrument of his vindictiveness. He has built a fantasy world for her promising her visions of peace and hominess, discussing with her options of living which are legally impossible to attain, and as an officer of the court he knows that.
 Mr. Pantaleo has been attacking the judgment of the Court, the agreement which he entered into, almost since the day it was entered. He has filed motion, after motion, after motion. He has made an issue of the support and the property division. His attacks on the judgment have met with no success. The custody litigation reared it's head after those attacks failed.
 Like Mr. Paladino — and I have to tell you that this is so notable in it's absence, because even among the most bizarre and difficult cases I have heard, people have at least figured out that they might want to tell me that they love their child. CT Page 3532 Not once during this entire proceeding has Mr. Pantaleo expressed his concern in terms of loving his child. He's shown no insight into his child and he seems to be without any recognition that the relationship that he has forged with her, centered as it is on a change of her custody, is inappropriate and detrimental to her best interest.
 Earlier in the proceeding I took note of the fact that the request for psychological or psychiatric examination had been opposed by Mr. Pantaleo, and offered to the parties the possibility, since I would have liked to have had that information, to have it done. I haven't heard anything back. But I have to tell you it's of little use to me at this point and I think I have enough information because Mr. Pantaleo's lack of conscience, his lack of self-reflection, his lack of empathy is so pronounced that I don't need a psychiatrist to tell me that he would not be a parent beneficial to his child's interests. I think he, as a custodial parent, would be lethal to his child's best interest.
 A little girl was brought into this court — she's almost fifteen so maybe it's not fair to call her a little girl, but the impression of the young lady standing in front of me, frightened, shaking, shaking! Visibly shaking as she stood in this court room. Fleeing this court room! And she did flee this court room — apparently to spend an afternoon with gastro-intestinal distress in a bathroom. That any parent could have seen the shape that child was in, and still have brought her into a courtroom, tells me that that parent is oblivious to a child's best interest.
 I never thought as a judge I would be doing this. I never thought I would get as hokey as saying — you know, the story of Solomon teaches us a lot, but in this court it pretty much rules most of the cases that I see. Many of the cases that I see are similar to this, that I have one parent on a mission where nothing gets in the way and another parent sacrificing, trying to hold back, trying to just keep up and understanding that the child is being damaged.
 It is absolutely true that Ashley Pantaleo has told everybody in sight that she wants to live with her father. And it is absolutely true that the Court should, with a child of this age, take those wishes into account. But I also find that the evidence disclosed to me by Mr. Pantaleo's own admission — the fact CT Page 3533 that he was so forthright underscores to me that he hasn't got an idea of how inappropriate or damaging it is to behave this way — but he has discussed at length, in great detail, the law, Ashley's rights, how to go about doing things, and his plans for the future. I can't put a whole lot of stock in what Ashley says under these circumstances. I think that she has been under tremendous pressure and tremendous influence. I'm sure that like every kid she loves her parents, she wants to be able to move freely back and forth between their homes, and she'd like a little peace and quiet. She's unable to do that.
 That Ashley has not become more difficult, more self-destructive, more at risk is a miracle. If she continues under this type of pressure I am terribly concerned that she will in fact succumb in the ways that teenagers do to this kind of pressure. They become sexually active; they become promiscuous; they take drugs; they engage in risk-taking behavior — this is what kids who are under emotional pressure do. So I believe that at least two of the people who saw Ashley said she needed counseling right away and that's going to be part of my order because I want to make sure there's a place where Ashley can go to dump all this pressure. And I don't often get to see the kids — I see pictures of them; they're always looking happy and nice in the pictures, but I don't often get to see them in the stark reality of their pain, like I got to see Ashley. And I would put her out of her misery, Mr. Pantaleo — since you don't seem to be able to control yourself — by telling her that you don't have the right to visit with her anymore. But I'm not going to do that today because I believe that Ashley loves you and I don't want to punish Ashley or make her feel that she has in any way hampered your ability to see her. And I have a feeling that this is a kid that's going to take responsibility for everything because she's borne the inappropriate burden of so much.
 So I'm going to leave custody with Ms. Pantaleo and I'm going to leave the visitation order as it is with this proviso: There's to be no discussion with y Ashley of custody, of litigation, of anything pertaining to the relationship between you and her mother, of anything pertaining to the relationship between she and her mother. It's all off limits. If she says "What happened in court?" The response is: "The judge told me I can't talk to you about it. Maybe you should call Mr. Parley or you can talk to your mother." If she comes and she says to you, "I want to talk about custody." Your response is: "Ashley, we're taking a break CT Page 3534 from talking about custody. The judge told me that we had to do that." So you are not to discuss the litigation or a change in custody with her. I'm not telling you that you can't file a motion come some change in circumstances. I'm just saying you cannot discuss it with her. You're to give her no legal advice. If she asks you any questions about what the law allows, she's got a lawyer. Tell her to ask him. Tell her the judge told you you can't do that too.
 I want to note that there has been some indication there clearly is a history here of some things that have occurred. In 1996 Ashley did go to somebody at the school and told that person that her mother had hit her. I find the circumstances surrounding that complaint to be suspicious in that the complaint came after time spent with her father and that curiously enough, by noon Mr. Pantaleo had called the school to inquire whether or not a DCF report had been filed. I find that there's no substance at all to the allegations of abuse, hitting, soup throwing — lots of charges have been thrown around with very little evidence or proof of them. I believe that Ms. Pantaleo provides a stable home. Whatever the difficulties between these parties before and their history, since the time of the dissolution Ashley's gone to school. When needs were — whatever her difficulties were when inadequacies were noted by the school regarding Ashley's appearance her mother worked with her. Those things have improved. Mr. Pantaleo too has joined in recently and assisted her in her socialization, but the signing up of kids for basketball and baseball does not make a custodial parent. And what is missing, Mr. Pantaleo, is that you have little comprehension of the emotional consequences of your behavior on others. You seem to have little conscience; you seem to have little respect for the truth and I don't think that that kind of person is in any shape to be a custodial parent. I think your judgement is lacking in certain regards.
 For instance, you have expressed to the Court the stability of this home and the step-mother figure. You're living with a woman to whom you are not married. Your testimony has more than a tinge of resentment regarding her financial contributions. You have your child visit in the home where you are living with another person to whom you are not married and with whom you have a sexual relationship. I don't think that's right. I would not stand in front of a Court and call that a model of stability. It's not a committed relationship; there's no commitment to the world and when you're raising a teenage daughter in a dangerous CT Page 3535 world where sexual behavior carries the risk of death, and you're trying to get your kids to not be sexually active, there has to be some more reflection about the example that you're setting.
 Now, that in and of itself would not have made my custody determination, but it is yet another example of mostly, Mr. Pantaleo, all of the litigation is based on your view, your strongly held opinions, about how everything appears to be, and your version of reality doesn't live with that which others might see. What Ashley needs from you is to support her relationship with her mother. There's a lot of studies out there now that tell you what kids need after a divorce. They need peace and quiet and they need their parents to respect each other, but I don't believe there has been any substantial change in circumstance; I don't believe there's any issue which affects Ashley's custodial relationship with her mother other than Ashley's adamant expression that she wants to live with her father. That in an of itself, given these circumstances, given your relentless pressure on the child and your inappropriate sharing of information, you've set this child up as your rescuer and your savior. You've done it for two years. She's a kid. She's not going to help you out of your financial problems; she's not going to help you out of your emotional problems. You've set her up as the rescuer. When you say, "Gee Ashley, we could be better off if I didn't have to pay child support", you're setting her up to save you and that's how a kid hears it. It's inappropriate; it should never have been said. It will not be said again. You have no discussion regarding finances with her as well, none. Given the pressure, her adamant expressions hold little weight.
 On to the other issues. Regarding the motion for modification of child support, I believe that the deviation criteria were adequately expressed in the record. Let's put this in context for an Appellate Court.
 This case came to Judge Bassick as an agreement. Everybody was represented. Ashley was represented. Child support guidelines were filled out and presented to the Court along with all the other documentation. Mr. Parley took the time to actually fill the document out with the deviation criteria expressed. It was a deviation upwards and not a deviation down; Courts like deviations upwards. And the deviation said what it said and Judge Bassick in the transcript notes that he has read it; he has reviewed it, and he is making it a record. CT Page 3536
 Now, it's very interesting — he's making it part of the file. Now it's very interesting that we have come almost full circle on deviation criteria. First you had to express the deviation criteria and now, I believe since October, you have to express them in writing. This case actually complied years ahead of time. It had the deviation criteria in writing, in the file. Amazing! So I don't know why it shouldn't be adequate. It complied with what is necessary under the law now before anybody ever thought it was necessary. So I think it's adequate, but just in case, I'll address the other grounds as well because I think that the motion for modification fails for either of the grounds.
 Mr. Pantaleo handed a financial affidavit to the Court which was clearly prepared in haste; is not in compliance with the Practice Book rules; does not reflect the last thirteen weeks — doesn't reflect the last year. It was based on looking in his 1996 income tax return and then ball-parking it against his 1997 and thinking it looked about the same, for both his expenses at work and his income, his receipts.
 Upon cross examination the affidavit did not appear to withstand cross examination well in terms of it's accuracy because the response to many questions was: "Well, it's close; it's pretty close to that; it's close to this" This is suppose to be a true and accurate statement of the last thirteen weeks so that a Court can get a picture of what's going on now. Mr. Pantaleo chose to re-write the rules and do it his way. You suffer the consequences for that, Mr. Pantaleo, the financial affidavit doesn't have a lot of credibility to me, number one. Number two: If you spent as much time looking for clients as you do in court litigating on your own lawsuits you would actually be able to meet the earning capacity that this Court believes that you have.
 You are a member of the bar; you've been a member of the bar for a long time. You had a good practice and you were a well respected member of the bar. At the time of the dissolution you were earning certain amount of money and even at that time was less than your potential earning capacity, but given the litigation, the divorce and everything else, and the emotional toll it was what it was. But I believe that your earning capacity is far greater; your earning capacity is at least what it was at the time of the dissolution. I think it's notable that when I said, "When can we reschedule?" You said, "I can be here tomorrow" Everybody else had to check their book. The litigation CT Page 3537 has taken on a distorted role in your life which has affected your earning capacity detrimentally and that is all willful on your own part. So any change in your circumstances due to a lower amount of income, number one: I don't believe it's credible because I do not have an accurate financial affidavit and I don't think you can come here and with clean hands say, "I'm not going to abide by the Practice Book rules. I'm not going to fill out the financial affidavit the same way everybody else does. I'm not going to play by the rules, but give me help. " This is a court of equity and I don't have to do it. So number one, it's denied for that reason. And number two: The Court finds that you have an earning capacity at least equal to that which you were making at the time of the dissolution but for your dedicated attention to the cottage industry that you have given rise to which pays nothing, but supports once again your unrelenting vindictiveness about anybody and everybody who touches this case. I mean, I've read the file. The accusations against Mr. Parley; the accusations against Mr. Paladino; the accusations against every judge who's touched the case are outrageous. The file is — how many folders?
CLERK: Six.
 THE COURT: Six folders. Except for Smulewicz-Zucker I think that's our record in this case and it's close to that. I think they're at eight.
CLERK: Ten.
 THE COURT: Ten. Secondly, regarding a failure to deviate — I mean, to articulate the deviation. You've had your evidentiary hearing here and now and I still think it's appropriate to deviate from the guidelines — and I'll articulate the reasons why today it is appropriate to deviate from the guidelines. Number one: There is a history in this case. There was an articulation of a deviation offered to the Court. Whether it was adequate or not adequate I'll leave to somebody else, but offered to the Court which still holds today. That is, that the deviation was done as part of the mosaic which formed the property settlement; which helped to establish a home for your daughter and it was deemed to be appropriate and by agreement with everybody. Nobody contested it then. Today — well, let me read it exactly:
"The overall monthly payment will exceed the guidelines and CT Page 3538 allow the parties to protect the family residence and effectuate a fair property division. Settlement is in the child's best interest in this case because of those reasons and there are going to be contributions toward medical expenses and helping the child with counseling"
Those were what were articulated then. Those are all still good reasons for today. The deviation was clearly designed to assist Ashley.
 In addition, today there are other deviation criteria, in addition to those which the Court would like to articulate. Number one: There's evidence before the Court about the amount of time that Mr. Pantaleo spends on his self-generated litigation which promotes his interests as opposed to work. I think it was Mr. Paladino who questioned him, I'm not sure, but — I can't remember if it was Mr. Parley or Mr. Paladino. Clearly the devotion to this cause has, as I said, detrimentally affected his earning capacity. In addition, in terms of equitable factors, Mr. Pantaleo has, over a period of time, affected Ms. Pantaleo's earning capacity. I have evidence before me — and the Court finds this credible — that this litigation, subpoenas, documentation requests sent to an employer sometime back, cost a job and I accept that evidence. So I think it would also be inequitable to not say that there has to be some compensation when somebody seeks — uses litigation as a tool with which to harm others — that there not be some place where one is held accountable for that and where else but a court of equity. So I think (A) The deviation criteria would articulate it; Two: If they weren't articulated they're articulated now; and Three: There hasn't been any change of circumstances except that which Mr. Pantaleo has caused himself.
 Regarding the house. There is absolutely, positively no law anywhere in the State of Connecticut which allows an order regarding the home; that is, somebody else getting exclusive use and possession. Passamano did not say that. If this were Federal Court the claim would be sanctionable under Rule 11. We just have that dinky, untrue pleading thing. There is no law anywhere to substantiate that claim.
 Regarding the modifability of the child support orders. While I believe that all the other reasons I've articulated are probably sufficient, since it's been raised I'm going to address it because I don't want it to come up again. I believe that the CT Page 3539 statute which allows for the modification of alimony and child support orders is not drafted as a meaningless work. And it allows — it says, "except as otherwise provided." It says exactly: "To the extent the decree precludes modification, any final order for periodic payment of permanent alimony or support or pendente lite —" and then it goes on about the deviation criteria. It seems to me that where you have children who are represented — and so that you're not bargaining away their interests without somebody there to represent their interests — and where the bargain is we're going to protect a base-level of support which will keep a roof over a kid's head and we're not going to let you go below it — There's no problem with a non-modifiability because it's done to protect the child. And the reason that we're always worried about the non-modifiability is that we don't want to be able to undercut the children later if something helps their parents. The entire idea behind the entire statutory scheme is that parents are going to do what it takes to take care of their kids. That is, parents should do what it takes to take care of their kids. So a generation ago, you had a family that was intact and Dad needed to work a second job in order to pay the mortgage; he did. Mom had to go out to work to pay the mortgage; she did. And they said, "We want to leave our kid in this kind of house; we want that stability for our kid, we'll do whatever it takes." And that's all this agreement did. It said, "We care enough about Ashley to make sure that this will not be an issue for her in the future. It won't go below the mortgage payment because we don't want her to face that upheaval." So whether it's flipping burgers at McDonalds or practicing eighty hours a week instead of forty, that was the deal that was cut. I think that's in the best interest of the child. I think it's authorized under the statute. I don't have a problem with the non-modifiability under the circumstances of this particular case. I think that clearly the non-modifiability has to be looked at in terms of the children, their representation, the effect on a case by case basis. But I don't have any problem with it in this case and I agree with Judge Tierney that the statute isn't meaningless. It's there and it means something.
 Now, with regard to attorneys fees. Based on the combined financial circumstances of the parties, regarding Mr. Parley's fees. I find Mr. Parley's fees to be reasonable. I find his hourly rate to be reasonable. It may be true that somebody is willing to do this work cheaper but that doesn't mean anything in particular. I mean, it means that somebody is willing to do something cheaper. Mr. Parley was appointed by a Court. His CT Page 3540 appointment has been the subject of motions to disqualify; it has been the subject of accusations against judges; it's been examined, and examined, and examined over again. I'm not going to re-examine it now. He is counsel; this is what it costs. Those arguments have all been made before. So I find the fees to be reasonable; I find the hourly rate to be reasonable; I find the amount of fees due and owing is $15,450.00. And again, based on the combined financial circumstances of the parties, I apportion that to be paid 100 percent by Mr. Pantaleo and zero by Ms. Pantaleo. I order that it be paid within thirty days. Mr. Pantaleo is showing a balance of $54,000 dollars in his Merrill Lynch Pension Fund. It can be paid from that or a loan can be taken against that. Whatever you can do at Merrill Lynch, but you've got a $54,000 dollar asset showing on your financial affidavit.
 I'm going to order that should an appeal be taken that there be arrangements made to escrow the amount of the awarded fees so that they won't be dissipated during the time of the appeal and that the asset will be preserved. It will be escrowed obviously, in an interest bearing account or you can — if you take an appeal you can leave it in the account it's in now, but change it — change the names or the terms of it so there's no penalty regarding moving it. That might be unnecessary, but somehow it's got to be pledged or escrowed so it can't be moved.
 Regarding the request for fees by Mr. Paladino. Again, I've reviewed the financial affidavits of the parties. I find that Ms. Pantaleo is without means to pay those bills. That indeed, while Mr. Pantaleo has represented himself in the post-judgement matters she has run up counsel fees in the amount of $25,345 that were due and owing on a financial affidavit filed February 27th. They're even more today after days of trial. I find that Mr. Paladino's fee is reasonable, his hourly rate is reasonable, and I order that Mr. Pantaleo pay those within thirty days. And that amount is $19,627.90. Same order regarding escrow or pledging of an amount out of the Merrill Lynch or by setting up another account to secure it pending any appeal.
I've covered everybody's issues?
ATTORNEY PALADINO: I think so, Your Honor.
THE COURT: Oh, yes. I am going to order that CT Page 3541
 Ashley — that Ms. Pantaleo make arrangements for Ashley to obtain counseling; that initially the counseling be once a week unless the counselor deems that it's not necessary and that the cost of that counseling be split between the parties. Eighty percent Mr. Pantaleo, twenty percent Ms. Pantaleo. I order that each of you make whatever arrangements are necessary in advance with the counselor to make sure that payment will be had in accordance with the order of the Court so that nothing impedes the counseling — the start of counseling.
 In addition, I'm retaining jurisdiction over the file. I ask that should anybody take an appeal I will be more than glad, if you let me know, to articulate in writing anything that is not clear. I mean, I'll articulate — I normally do that. I put them in writing for the appeal. I'm going to sign this, but if you need anything more for purposes of an appeal file a request for articulation and I will respond to that. I don't articulate by specific point; I just write the decision. That's my articulation. So —
CLERK: Transcripts for now —
 THE COURT: The transcript for now is the memorandum of decision. I'm going to order that and I'm going to sign it and that's the memorandum of decision and if somebody wants something more, request the articulation and I'll — you may not want anything more — I'll deal with the articulation as it comes in. And I should just state for the record, I did this orally from the bench. I normally write them, but I did it because I really want to put Ashley out of her misery in terms of the suspense in not knowing — and I want her to understand that this is not a choice left to 14 or 15 year olds. This is an adult choice and while I have heard her, and I have heard her wishes, I don't think that her wishes are in her own best interest and I believe that the order that I have entered where she remains in her mother's custody and has a more stabilized relationship with her Dad that does not center upon change of custody, but just enjoying each others company. I think that's probably in her best interest. We're adjourned.
(End of session)
Elain Gordon, J.